UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| ANNA STEINMAN, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CV-01543 JAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying Anna Steinman's ("Steinman") application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.

**I.     Background**

On October 21, 2010, Steinman filed an application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. (Tr. 210) The Social Security Administration denied Steinman's claim for Social Security disability benefits on May 3, 2011. (Tr. 96-99) Following the initial denial, Steinman filed a timely Request for Hearing by Administrative Law Judge ("ALJ") on June 1, 2011. (Tr. 100-101) A hearing before the ALJ was held on September 6, 2012, along with a supplemental hearing on April 16, 2013. (Tr. 30; Tr. 72) On May 29, 2013, the ALJ issued a written decision denying Steinman's claim for Social Security disability benefits. (Tr. 6-27) Steinman requested a review of the ALJ's decision by the Social Security Administration Appeals Council ("Appeals Council"). (Tr. 4-5)   The Appeals

Council denied Steinman's request for review on May 29, 2013. (Tr. 1-3) Thus, the decision of the ALJ acts as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Steinman filed this Complaint on September 9, 2014. (Doc. 1) The Commissioner filed an Answer on November 6, 2014. (Doc. 7) On December 8, 2014, Steinman filed a Brief in Support of Complaint. (Doc. 9) The Commissioner filed a Brief in Support of the Answer on March 9, 2015. (Doc. 14) Steinman did not file a Reply Brief.

## II. Decision of the ALJ

In a decision dated May 29, 2013, the ALJ determined that Steinman meets the insured status requirements of the Social Security Act through September 30, 2014, and had not engaged in substantial activity since October 11, 2010, the alleged onset date. (Tr. 11) The ALJ found Steinman had the severe impairments of proliferative diabetic retinopathy, cataracts, glaucoma, diabetes mellitus with nephropathy and neuropathy, obesity, and degenerative joint disease, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-13)

After considering the entire record, the ALJ determined Steinman had the residual functional capacity ("RFC") to perform light work, except Steinman needs a sit/stand option which requires her to alternate sitting and standing on an hourly basis and avoid climbing ropes, ladders, scaffolds, and crawling. (Tr. 13) The ALJ concluded that Steinman can occasionally read fine print and can also understand, remember, and carry out at least simple instructions and non-detailed tasks. (Id.) Additionally, the ALJ found that Steinman is unable to perform any past relevant work but that there are jobs that exist in significant numbers in the national economy that she can perform, including a housekeeper, office helper, recreation aide, parking lot

attendant, packer, assembler, and product inspector. (Tr. 20-21) After determining that Steinman had been capable of transitioning to other work that exists in significant numbers in the national economy, the ALJ concluded that a finding of "not disabled" was appropriate. (Tr. 22) Thus, the ALJ determined that Steinman is not disabled under § 216(i) and § 223(d) of the Social Security Act. (Id.).

### III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

#### A. Hearing Testimony

The ALJ held a hearing in this matter on September 6, 2012, where the ALJ heard testimony from Steinman and Ms. Robin Cook ("Cook"), a vocational expert. (Tr. 30) A supplemental hearing in this matter was held on April 16, 2013, for the purpose of examining Mr. James Israel ("Israel"), a vocational expert. (Tr. 72)

##### 1. Steinman's Testimony

At the time of the hearing, on September 6, 2012, Steinman lived in a home with her husband and daughter. (Tr. 31) Her daughter was 27 years old. (Id.) Steinman does not have a GED, no vocational training, and no periods of self-employment. (Tr. 32) She has never filed a workers' compensation claim or applied for unemployment benefits. (Id.) Since October, 2010, she has not worked and filed her claim for disability benefits sometime in 2010. (Tr. 36-37) Her husband and daughter both work full-time. (Tr. 31) At the hearing, Steinman alleged disability based on her obesity, depression, blindness, diabetes, diabetic retinopathy, neuropathy, and knee impairment. (Tr. 46-48, 56, 59)

Steinman's past relevant work includes telemarketer, cake decorator, and greeter. (Tr. 33-35) In October of 2010, she stopped working due to loss of vision in the left and right eye and

claims that she could no longer see the computer. (Tr. 37-38) As pressure became increased in Steinman's eye, she was instructed by her doctor to no longer drive a vehicle, although she maintained a valid driver's license. (Tr. 37)

Steinman testified that she has had no vision out of the left eye since her first eye surgery in September of 2010 and that the vision in her right eye is blurry. (Tr. 44-45) Additionally, she had another surgery performed on the left eye and has had laser surgery on her right eye three times, along with several shots to decrease the bleeding in both eyes. (Id.) Currently, Steinman cannot read 'regular' newspaper print but does claim to be able to read 'big' print. (Tr. 46) She takes several medications to relieve her eye pressure and claims no side effects from these medications. (Tr. 39-40)

Steinman also has been diagnosed with diabetes. (Tr. 46) She is not compliant with her diabetic diet and exercise regimen and alleges that her non-compliance is due to depression as diagnosed by her primary care physician. (Tr. 47-48) In February of 2011, Steinman was directed by her primary care physician to engage in exercise to control her blood sugars. (Tr. 50) After a few months, she stopped walking but still moved her arms and legs around while in a seated position. (Tr. 51) She was also riding a stationary bike approximately four times a month. (Tr. 52) As pain and blood pressure returned to her eyes, Steinman decreased her exercise activity. (Tr. 53-54) She also experienced headaches due to bright lighting and the impact on her eyes. (Tr. 55)

Additionally, Steinman alleged that along with her diabetes she also has neuropathy in her legs. (Tr. 56) The neuropathy has caused an infection to result between her ankle and knee three times. (Tr. 58) This causes her to experience numbness in her feet and a fever in her leg. (Tr. 56) She experiences pain in her legs when she sits, stands, or walks. (Tr. 58-59) In addition

4

to the neuropathy, Steinman also testified that she has pain in her right knee. (Tr. 59) Further, Steinman claimed that her obesity results in her not feeling well and affects her ability to work. (Id.)

### 2. Vocational Expert's Testimony

#### a. Ms. Cook's Testimony

Vocational expert Ms. Cook testified that in accordance with the Dictionary of Occupational Titles and Selected Characteristics of Occupations ("DOT"), Steinman's past relevant work classifies as two applicable titles. (Tr. 62) Her multiple jobs as a telemarketer, DOT number 299.357-014, classified as semi-skilled work with a specific vocational preparation level ("SVP") of 3 and a sedentary exertional level. (Id.) While no specific DOT title exists for Walmart greeter, Cook determined that the closest applicable DOT title was Doorkeeper, DOT number 324.677-014, a semi-skilled position with a SVP of 2, and an exertional level of medium. (Id.)

The ALJ indicated that Steinman would be functionally limited to light exertional work, requires a sit/stand option, and can only occasionally read fine print. (Tr. 63) The ALJ also determined that Steinman should avoid crawling, avoid ropes, ladders and scaffolding; and, because of her mental impairment, would be limited to unskilled work. (Id.)

Due to Steinman's physical limitations, Cook testified that Steinman would not be able to perform any of her past relevant work. (Id.) However, Cook determined that there are jobs that a hypothetical individual, with the same educational and vocational background and residual functional capacity as the claimant, could perform. (Id.) Such a person could work as an Office helper, DOT number 239.567-010, SVP of 2, light work, with approximately 1,810 positions in the State of Missouri and 82,250 positions nationally. (Id.) Another possibility would be a

Recreation aid, DOT number 195.367-030, SVP of 2, light work, with approximately 4,450 positions in the State of Missouri and 253,110 positions nationally. (Tr. 64) Finally, such a person could perform the job of Parking lot attendant, DOT number 915.473-010, SVP of 2, light work, with approximately 2,200 positions in the State of Missouri and 126,160 positions nationally. (Id.)

### b. Mr. Israel's Testimony

Mr. Israel testified as a vocational expert in the supplemental hearing for Steinman on April 16, 2013. (Tr. 72) Israel testified that Steinman's work history, on an SGA basis, is as a Telemarketer, DOT number 299.357-014, SVP of 3, with a standard of semi-skilled work activity. (Tr. 76) Based on Steinman's limitations regarding a required stand/sit option, mental impairment, and limitation to an SVP level of 2, Israel explained that Steinman could no longer perform the work of a Telemarketer. (Tr. 77) Israel testified that with regards to Steinman's education, vocational background, and residual functional capacity, the available jobs would be limited to those with an SVP of 2. (Id.) One possibility would be a packer and wrapper, DOT number 92.685-026, SVP of 2, light work, with approximately 1,100 jobs available in Missouri and 52,800 nationally. (Id.) Another possibility would be an Assembler, DOT number 794.687-042, SVP of 2, unskilled, light work, with approximately 1,350 jobs in Missouri and 64,800 nationally. (Id.) A third example is product inspector, DOT number 529.687-186, SVP of 2, light, unskilled, with approximately 1,050 jobs available in Missouri and 50,400 nationally. (Tr. 78)

After his initial testimony, Israel was then presented with several hypothetical situations by Steinman's attorney. (Tr. 78-86) In the first hypothetical, Israel testified that an individual, who had a stand/sit option, at will instead of on the hour, would be inconsistent with gainful

6

employment due to the inability to stand or sit for consistent periods of time. (Tr. 78) Also, if the individual had to elevate her legs, from one to two feet for over 50 percent of the day, that physical limitation would also be inconsistent with any job. (Tr. 79) Israel also noted that an individual with a productivity deficit of six percent each day, that such deficit would remain within the work function range. (Id.) However, a productivity deficit of 33 percent each day would exceed the work function toleration point. (Tr. 80)

Israel next addressed a hypothetical situation where an individual was limited to sitting two hours in an eight hour day and standing and walking two hours in an eight hour day. (Tr. 81) Under those circumstances, Israel testified that such an individual would not be consistent with the standards of gainful employment. (Id.) Israel went on to testify that the possible jobs that he had previously described as possible for an individual similarly situated as Steinman, do not require walking in terms of essential job functions. (Tr. 83) Additionally, the DOT does give a spectrum of visual acuity necessary to perform the jobs as described by Israel. (Tr. 85) Speaking to a hypothetical regarding visual acuity, Israel testified that an individual would not be able to perform any jobs without any ability to interface with objects. (Tr. 87)

### B. Medical Records

The ALJ summarized Steinman's medical records at Tr. 14-20. Relevant medical records are discussed as part of the analysis.

### IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see

also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F. Supp. 2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495

F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
> (2) The education, background, work history, and age of the claimant;
> (3) The medical evidence given by the claimant's treating physicians;
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
> (5) The corroboration by third parties of the claimant's physical impairment;
> (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

### V.    Discussion

In her appeal of the Commissioner's decision, Steinman alleges that the ALJ's decision was not supported by substantial evidence. (Doc. 9 at 15). Specifically, Steinman asserts that the ALJ failed to properly consider the medical opinions of Dr. Thomas K. Krummenacher ("Dr. Krummenacher"), Dr. John Galanis ("Dr. Galanis"), and Dr. Denise Buck ("Dr. Buck") (Id.). Because the ALJ erred in failing to address Dr. Krummenacher's opinion regarding the significant issue of Steinman's vision, the Court will remand the case for the Commissioner to consider Dr. Krummenacher's opinion and reassess the other opinion evidence in the record.

Steinman began seeing Dr. Galanis, F.A.C.S. (Fellow of the American College of Surgeons), at the Galanis Cataract and Laser Eye Center, in January 2011. (Tr. 374, 408) At her initial examination with Dr. Galanis, Steinman still had 20/20 vision in the right eye, but did

have diabetic retinopathy. (Tr. 374) Steinman's visual acuity in the left eye was light perception only. (Id.) Dr. Galanis indicated that the visual prognosis for the left eye was poor, but recommended cyclocryotherapy[1] to improve pressure control in the eye (Tr. 375). The procedure was performed within a few days, and repeated in March 2011. (Tr. 340, 381-85) Follow-up appointments showed reduced eye pressure in the left eye and that Steinman's right eye visual acuity remained at 20/25. (Tr. 376, 394) Steinman subsequently presented to Dr. Galanis with complaints of cloudy vision and "floaters" in the right eye. (Tr. 388)

In June 2011, Dr. Galanis completed a Vision Impairment Residual Functional Capacity Questionnaire. He noted that visual acuity in Steinman's right eye after best correction was 20/25, but light perception only in the left eye. (Tr. 371) Dr. Galanis opined that Steinman could frequently perform work activities involving near and far acuity, color vision and field of vision, but accommodation only occasionally, and could never perform work activities involving depth perception. (Tr. 372) He further opined that she was not capable of avoiding ordinary hazards in the workplace such as boxes on the floor, doors ajar, or approaching people or vehicles. (Id.) Dr. Galanis opined that Steinman would need to take two unscheduled breaks per day (Tr. 373)

In December of 2011, Dr. Galanis referred Steinman to Dr. Krummenacher, a specialist in ophthalmology at Retina and Vitreous Consultants and an associate clinical professor of ophthalmology at St. Louis University School of Medicine (Tr. 388). At her initial visit with Dr. Krummenacher, Steinman's visual acuity in the right eye remained 20/25 but the retinopathy in the right eye had progressed from non-proliferative to proliferative. (Tr. 444) Dr. Krummenacher

---

[1] "Cyclocryotherapy (CCT) is a procedure that employs temperatures as low as -112°F (-80°C) to destroy the ciliary body, an organ in the anterior chamber of the eye behind the iris, which produces aqueous fluid. A certain amount of fluid is required to maintain the integrity of the eye, but an increase in intraocular fluid leads to an elevation in intraocular pressure (IOP); elevated IOP is a major cause of glaucoma. Ablation, or destruction, of part of the ciliary body lowers the IOP by decreasing the fluid or aqueous humor within the eye and thus helping to control glaucoma. The main purpose of CCT is to treat uncontrolled or refractory glaucoma. It is also used to reduce ocular pain in some patients with end-stage glaucoma." Cyclocryotherapy, http://www.surgeryencyclopedia.com/Ce-Fi/Cyclocryotherapy.html#ixzz3mn3nsy2j (last visited Sept. 25, 2015).

performed pan-retinal ablation[2] on the right eye in December 2011, and again in March 2012. (Tr. 423, 427-30, 438-40) Despite these efforts, Steinman's visual acuity in the right eye was 20/40 (Tr. 424). In July 2012, Steinman reported a significant change in her right eye vision with sudden blurring. (Tr. 410) Upon examination, Dr. Krummenacher indicated that Steinman was suffering hemorrhaging in the eye from her proliferative diabetic retinopathy resulting in a visual acuity in the right eye of 20/100. (Tr. 410) Dr. Krummenacher performed Avastin injections, a medication designed to block the growth of abnormal blood vessels, and he also recommended additional laser treatment. (Tr. 410)

On August 3, 2012, Dr. Krummenacher completed a Residual Functional Capacity Questionnaire concerning Steinman. (Tr. 475-477) He indicated that he had seen Steinman as a patient 7 times between December 6, 2011 and July 6, 2012. (Tr. 475) Dr. Krummenacher listed Steinman's diagnoses as glaucoma; insulin, long term use; diabetes with ophthalmic manifestations; proliferative diabetic retinopathy; diabetic macular edema; and vitreous hemorrhage. (Id.) He noted that Steinman's symptoms include blurry vision in the right eye, floaters in the right eye, and dim, limited vision in the left eye. (Id.) He also opined that Steinman is unable to perform ordinary tasks requiring fair vision and unable to climb ladders due to limited vision and poor depth perception. (Tr. 476) Dr. Krummenacher further indicated that Steinman would never be able to perform work activities involving far acuity, depth perception, or field of vision and would rarely be able to perform work activities involving near acuity, accommodation, or color vision. (Id.).

---

[2] Pan-Retinal Ablation "is used to slow the growth of new abnormal blood vessels that have developed over a wider area of the retina to stop the blood vessels from growing." Laser Photocoagulation for Diabetic Retinopathy, available at http://www.webmd.com/diabetes/laser-photocoagulation-for-diabetic-retinopathy (last visited Sept. 25, 2015).

The regulations specify that the ALJ "will always give good reasons in [the] notice of determination or decision for the weight [he or she] give[s] [a] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). In other words, the ALJ is required to address a medical opinion from a treating source. See Ahlstrom v. Astrue, No. CIV. 08-5768(RHK/RLE), 2010 WL 147880, at *24 (D. Minn. Jan. 11, 2010). See also Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014) ("'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.'") (quoting Snead v. Barnahrt, 360 F.3d 834, 838 (8th Cir. 2004). A treating physician's opinion is generally entitled to substantial weight but does not automatically control. Brown v. Astrue, 611 F.3d 941, 951 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 880 (8th Cir.2009) (internal quotations and citation omitted). "An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Id. However, "[w]hether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." Andrews v. Colvin, No. 4:13-cv-1033-NAB, 2014 WL 2968815, at *2 (E.D. Mo. July 1, 2014) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).

The ALJ erroneously attributed both Dr. Galanis' 2011 opinion and Dr. Krummenacher's 2012 opinion to Dr. Galanis. Relying on this mistaken belief, the ALJ concluded "The undersigned gives little weight to the latter assessment [(the 2012 Questionnaire actually completed by Dr. Krummenacher)], due to the lack of medical treatment records prior to the date of the statement." (Tr. 19) In so-finding, the ALJ indicated, "Although the doctor noted seven visits between December 6, 2011 and July 6, 2012, there were no treatment records submitted

into evidence from Dr. Galanis dated after December 2011." (Id.) The ALJ also discounted both the 2011 opinion and the 2012 opinion because they were presumptively from the same physician but "complete opposites." (Id.)

Although the Commissioner concedes that the ALJ erred in attributing the 2012 opinion to Dr. Galanis, she asserts that the ALJ gave other reasons for discrediting it. Specifically, the Commissioner notes that the ALJ indicated that subsequent treatment records from Dr. Krummenacher revealed improvements in Steinman's right eye vision and that her left eye vision was stable. The ALJ also noted that there was not any evidence in the medical treatment records after December 2011 showing Steinman could not perform all work activities. As more thoroughly detailed above, after December 2011, Steinman received her ophthomalic treatment primarily from Dr. Krummenacher. The medical records generally, and especially those of Dr. Krummenacher, depict a steady decline in Steinman's vision in her right eye. Furthermore, the fact remains that the ALJ failed to address Dr. Krummenacher's opinion, and instead evaluated that opinion as if it was from another physician and in the context of that other physician's treatment notes. The ALJ also improperly discounted Dr. Galanis' 2011 opinion because she incorrectly concluded that Dr. Krummenacher's 2012 opinion was that of Dr. Galanis and therefore determined his assessment of her prognosis was inconsistent across what she thought were his two wildly differing opinions.

In sum, the ALJ failed to appropriately address the opinion of Dr. Krummenacher, a treating physician, on the significant issue of Steinman's vision. Furthermore, because of this failure, the ALJ's review of at least one other medical opinion was adversely impacted. Thus, remand is required. See Anderson v. Barnhart, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for

remand"); Clover v. Astrue, No. 4:07CV574–DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug. 19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand."); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give to your treating source's opinion.").

**VI.    Conclusion**

For the foregoing reasons, the Court finds the ALJ's decision was not based on substantial evidence in the record as a whole and should be reversed and remanded. On remand, the ALJ is directed to assess Dr. Krummenacher's opinion under the appropriate regulations; reassess the other opinion evidence in the record under the appropriate regulations; further develop the medical record if necessary; and then continue with the next steps of the sequential evaluation process.

**IT IS HEREBY ORDERED** that this action is **REVERSED AND REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration in accordance with this Memorandum and Order.

A separate Judgment will accompany this Order.

Dated this 28th day of September, 2015.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**